## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------------X
In re                                         :    Chapter 11
                                              :
BLAKE OF CHICAGO CORP., et al.,               :    Case No. 04-12002 (CGC)
                                              :
                 Debtors.                     :    Jointly Administered
------------------------------------------------------------------X
A.B. DICK COMPANY and                         :
PARAGON CORPORATE HOLDINGS, INC.,             :
                                              :    Case No. 1:05-CV-00116-KAJ
                 Plaintiffs,                   :
                                              :
           v.                                 :
                                              :
MHR CAPITAL PARTNERS, L.P.,                   :
MHR INSTITUTIONAL PARTNERS, L.P.,             :
MHRM, L.P., and MHR FUND MANAGEMENT LLC,      :
                                              :
                 Defendants.                  :
------------------------------------------------------------------X
MHR CAPITAL PARTNERS, L.P.,                   :
MHR INSTITUTIONAL PARTNERS, L.P.,             :
and MHRM, L.P.,                               :    Case No. 1:05-CV-00115-KAJ
                                              :
           Third-Party Plaintiffs,            :
                                              :
           v.                                 :
                                              :
N.E.S. INVESTMENT COMPANY, et al.,            :
                                              :
           Third-Party Defendants.            :
------------------------------------------------------------------X
```

## COMPENDIUM OF UNREPORTED CASES

Dated:  August 15, 2005          LANDIS RATH & COBB
                                 Richard S. Cobb (No. 3157)
                                 Kerri K. Mumford  (No. 4126)
                                 919 Market Street, Suite 600
                                 Wilmington, DE  19801
                                 (302) 467-4400

# UNREPORTED CASES

*Abex Inc. and Wheelabrator Technologies Inc. v. Koll Real Estate Group, Inc.*
1994 Del. Ch. LEXIS 213 (Del. Ch. Dec. 22, 2004) .................................................................... 1

*Business Funding Group, Inc. v. Architectural Renovators, Inc.,*
1993 Del. Ch. LEXIS 51 (Del. Ch. Mar. 31, 1993) .................................................................... 2

*Metro Ambulance, Inc. v. Eastern Medical Billing Inc.,*
1995 Del. Ch. LEXIS 84 (Del. Ch. July 5, 1995) ....................................................................... 3

*Preston v. Preston,*
1981 Del. Ch. LEXIS 577 (Del. Ch. April 16, 1981) .................................................................. 4

**1**

LEXSEE 1994 DEL CH LEXIS 213

**ABEX INC., a Delaware corporation, and WHEELABRATOR TECHNOLOGIES INC., a Delaware corporation, Plaintiffs, v. KOLL REAL ESTATE GROUP, INC., a Delaware corporation, Defendant.**

**Civil Action No. 13462**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1994 Del. Ch. LEXIS 213*

**October 16, 1994, Date Submitted**
**December 22, 1994, Date Decided**

**NOTICE:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1]

Michael D. Goldman, Stephen C. Norman, and Kevin R. Shannon, Esquires, of POTTER ANDERSON & CORROON, Wilmington, Delaware; Jay Cohen, Esquire, of PAUL, WEISS, RIFKIND, WHARTON & GARRISON, New York, New York; Attorneys for Plaintiffs.

Allen M. Terrell, Jr., and Claudia A. DelGross, Esquires, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware; Joseph E. Thomas, and Kathlene W. Lowe, Esquires, of BROBECK, PHLEGER & HARRISON, Newport Beach, California; Attorneys for Defendant.

**JUDGES:** JACOBS, VICE CHANCELLOR

**OPINIONBY:** JACOBS

**OPINION:**

MEMORANDUM OPINION

*JACOBS, VICE CHANCELLOR*

The plaintiffs in this action, Abex, Inc. ("Abex") and Wheelabrator Technologies Inc. ("WTI"), seek declaratory, specific enforcement, and damage relief against the defendant, Koll Real Estate Group, Inc. ("Koll"). Specifically, the plaintiffs seek a declaration that (i) Koll is obligated, by virtue of certain tax sharing agreements, to contribute its $20,815,000 share of the settlement of a tax

dispute that was concluded on March 24, 1994 between the plaintiffs and the United States Internal Revenue Service ("IRS"), and that (ii) the plaintiffs breached no fiduciary, contractual, or other duties in concluding that settlement. Plaintiffs [*2] also seek a money judgment for $20,815,000, plus prejudgment interest and an award of their costs and attorneys fees incurred in prosecuting this litigation. Koll contests all these claims.

Plaintiffs commenced this action on April 13, 1994. The parties engaged in expedited discovery, and a trial was held on September 7-12, 1994. This is the decision of the Court, after final hearing and post-trial briefing, on the merits of this action.

I. THE FACTS

The material facts underlying this controversy are largely undisputed, but where the facts are contested, they are as found herein.

A. Background: The 1988, 1989, and 1992 Spinoffs

Until December, 1988, the plaintiffs (Abex and WTI) and the defendant (Koll) were all part of a diversified group of industrial companies known as The Henley Group, Inc. ("Henley"). These entities or their predecessors formed a consolidated group of companies for federal income tax purposes during the period May 26, 1986 through December 31, 1988 (the "1988 Tax Period").

Over the next three years, Henley divided itself into several different public companies. Henley did that by engaging in a series of "spinoffs" of assets representing different segments [*3] of its business. Because those spinoffs broke up the consolidated group, Henley could no longer file a consolidated tax return. Accordingly, it became necessary to allocate the Henley Group's pre-spinoff consolidated tax liability among the post-spinoff entities. That was accomplished by a series of Tax Sharing Agreements that are described in Part I B below.

The first spinoff transaction occurred in December, 1988. Henley formed, and then spun off, a new subsidiary called Henley Newco, Inc. ("Newco"). Henley then changed its name to "The Wheelabrator Group Inc.," and thereafter to "WTI"; and Newco changed its name to The Henley Group, Inc. ("Henley II"). The result was to allocate Henley's "refuse to energy" businesses to WTI, and Henley's other businesses to Henley II.

In 1989, Henley II formed, and spun off, a new subsidiary called "New Henley." Henley II then changed its name, first to Henley Properties Inc. ("Properties"), then to the Bolsa Chica Company ("Bolsa Chica"), and finally (when Bolsa Chica acquired the Koll Real Estate Group in September, 1993), to Koll. As a result, Henley II's real estate assets were allocated to Properties (Koll), and its remaining assets were allocated [*4] to New Henley, which changed its name to The Henley Group, Inc. ("Henley III").

In June, 1992, Henley III spun off Abex, allocating to that entity Henley III's aerospace and automotive businesses, while retaining cash and investments. To improve the balance sheet of Properties (Koll), Henley III was merged into one of Properties' (Koll's) subsidiaries.

The end result of this complex sequence of transactions was that the "The Henley Group Inc." kingdom, like Gaul, became divided into three parts: WTI (in the 1988 spinoff), Koll (in the 1989 spinoff), and Abex (in the 1992 spinoff).

B. The Tax Sharing Agreements

In connection with each spinoff, the parties thereto entered into a Tax Sharing Agreement. As noted, those Agreements were needed to allocate the Henley consolidated group's pre-spinoff tax liability among Henley's post-spinoff corporate components. Those Agreements are now described. Although the signatories to the Tax Sharing Agreements were the predecessors in interest of the parties to this litigation, for clarity of reference the original contracting parties will be given the names of their present successors in interest (and current parties litigant): WTI, Abex, and [*5] Koll.

1. The 1988 Agreement

On December 15, 1988, Henley (WTI) and New Henley (Koll) entered into an agreement ("the 1988 Agreement") whereby WTI would pay the first $50 million of any increased tax liability of the consolidated group for the 1988 Tax Period. n1 Any increased liability above the first $50 million (with certain exceptions not relevant here) would be the responsibility of Koll. Because Koll would have unlimited potential liability above WTI's $50 million "cap," the 1988 Agreement empowered Koll

to "control and direct the conduct of . . . any tax audit or inquiry or any administrative or judicial appeal or other proceeding" relating to the 1988 Tax Period. It further provided that Koll "shall, in its sole discretion, agree to pay, settle or compromise or concede any such claim or issue with respect to such proceeding which it may control." (PX 1 and 1A, § 6.01(b) (emphasis added).

> n1 In 1994, WTI, Koll, and Abex amended the 1988 Agreement to increase WTI's tax liability from $50 million to $51 million. Those parties also expressly ratified and confirmed the 1988 Agreement.

[*6]

2. The 1989 Agreement

By a contract dated December 18, 1989 ("the 1989 Agreement"), Henley II (Koll) and Newco (Henley III) agreed, in anticipation of the 1989 spinoff, to "cap" Koll's previously unlimited obligation to indemnify WTI (under the 1988 Agreement), at $25 million. That was accomplished by Henley III agreeing to indemnify Koll against any increase in the consolidated group's liability for the 1988 Tax Period above $25 million, and by Koll agreeing to indemnify Henley III for all such increases up to $25 million (the limit of its cap).

Thus, Henley III became the party with potentially unlimited exposure. For that reason, Henley III succeeded to the right—originally provided to Koll under the 1988 Agreement—to conduct and control, compromise or settle, in its sole discretion, any audit or tax proceeding relating to the 1988 Tax Period. n2 The only contractual limitation on that discretion was the requirement that Henley III undertake the conduct and/or settlement of a tax dispute "with the same diligence and care as if such action pertained to a Tax Item [of a Henley III] Business, and as if any amount . . . were payable by or to [Henley III]." (PX 2 and 2A, § [*7] 6.01(a)).

> n2 The 1989 Agreement empowered Henley III to "take any action which [Koll] may take . . . pursuant to the [1988 Agreement] . . . with respect to any contest affecting a Tax Item of any such entity or any amount payable or alleged to be payable under such agreements." (PX 2 and 2A, § 6.01(a)(iii)).

Taken together, the 1988 and the 1989 Agreements apportioned the first $50 million of tax liability (up to WTI's cap for the 1988 Tax Period) to WTI; apportioned the next $25 million (up to Koll's cap) to Koll; and allocated all liability above $75 million (the combined amount of WTI's

and Koll's caps) to Henley III.

### 3. The 1992 Agreement

The third of these Tax Sharing Agreements was entered into between Henley III and Abex, effective June 10, 1992 (the "1992 Agreement"). Under the 1992 Agreement, Abex stepped into Henley III's shoes and assumed Henley III's unlimited potential liability under the 1989 Agreement for tax increases above $75 million. Because Abex had become the party having potentially unlimited [*8] exposure, the 1992 Agreement provided that "Abex shall succeed to all of the rights and obligations of [Henley III] described in Article VI of the [1989 Agreement] relating to the conduct of any audit or other proceedings with respect to Taxes." (PX 3 and 3A, § 7.01(a)). Abex thereby succeeded to Henley III's right to conduct, direct, and settle, in its sole discretion, any tax audit or other tax proceedings relating to the 1988 Tax Period.

In short, by virtue of the 1992 and 1989 Agreements Abex succeeded to the right, originally given to Koll under the 1988 Agreement, to control, in its "sole discretion," the settlement of any tax disputes relating to the 1988 Tax Period. Those Agreements did not require Abex to obtain Koll's or WTI's consent to settle any disputed tax claim, nor did they entitle WTI or Koll to participate in any tax litigation, relating to the 1988 Tax Period. n3

> n3 However, as discussed in Part IV B(1), infra, such participation and "prior consent" rights were conferred upon Koll in connection with tax disputes arising out of post–1988 tax periods.

[*9]

### C. The Santa Fe Tax Issue And Its Resolution

In April, 1990, the IRS began a tax audit of the Henley consolidated group for the 1988 Tax Period. In accordance with the Tax Sharing Agreements, Henley III handled the audit and responded to the IRS's requests for information and documents. After the 1992 Agreement was executed, Abex took over Henley III's role.

The audit was concluded in late 1992, and the IRS objected to Henley's treatment of several items, including the so-called "Santa Fe tax issue" described below. In December, 1992, Abex and the IRS agreed to settle all tax issues for the 1988 Tax Period, except the Santa Fe tax issue. As a result, WTI and Koll paid approximately $60 million in tax increases pursuant to the Tax Sharing Agreements. Because that 1993 tax payment exceeded WTI's $50 million cap, Koll was required to contribute $7.6 million to that payment, and it did so without objection.

That left unresolved the Santa Fe tax issue. The settlement of that issue, and the parties' later dispute over Koll's obligation to contribute to the Santa Fe tax settlement, is what this litigation is about. Because an understanding of the nature and settlement of the Santa Fe [*10] tax issue is essential to the resolution of this lawsuit, a somewhat extended discussion of that topic is required.

* * *

The Santa Fe tax issue was a consequence of Henley's unsuccessful attempt to acquire Santa Fe Southern Pacific Corp. ("Santa Fe") in 1987 and 1988. During 1986 and 1987, Henley subsidiaries purchased 25 million shares (about 15%) of Santa Fe common stock, representing an approximately $1 billion investment. Those holdings were consolidated into one subsidiary, Henley Nucorp ("Nucorp"). Henley then launched a hotly contested proxy fight for control of Santa Fe. In response, Santa Fe declared an extraordinary dividend of approximately $30 per share, which resulted in a payment to Nucorp of about $750 million. Nucorp distributed the entire $750 million to Henley, its parent and sole shareholder. Ultimately, Henley abandoned its effort to gain control of Santa Fe, and in the fall of 1988 Henley sold Nucorp (whose sole asset was the 25 million Santa Fe shares) to Itel Corp.

The tax issue arose out of Henley's tax treatment of its basis in the Santa Fe stock at the time Henley sold Nucorp to Itel. At the risk of oversimplifying, under *§ 1059 of the Internal Revenue* [*11] *Code* (the "Code"), Nucorp's receipt of the extraordinary $750 million dividend required Nucorp to reduce its basis in its Santa Fe shares from $1 billion to $400 million. Henley's later receipt of that $750 million distribution from Nucorp also required Henley to adjust its basis in Nucorp. Henley interpreted both the Code and the tax regulations that governed the $750 million distribution from Nucorp to its parent, to require a basis reduction of only $250 million. Under Henley's interpretation of those provisions, Henley's basis in Nucorp exceeded Nucorp's basis in its Santa Fe shares by approximately $350 million. n4

> n4 Henley took that position, even though (i) the Santa Fe stock was Nucorp's sole asset, and (ii) Nucorp had distributed to Henley the entire $750 million dividend it received in respect of that stock.

Thus, when Henley sold Nucorp in 1988, Henley claimed a basis of $750 million in Nucorp for tax purposes ($1 billion less $250 million). That is significant, because if Henley had held the [*12] Santa Fe shares directly rather than through a subsidiary (Nucorp), Henley's tax basis in those shares would have been $400 million, i.e., $350 million less. That $350 million basis difference

enabled Henley to record a substantial capital loss, and thereby to realize a significant tax benefit, on its 1988 tax return. It is that benefit that the IRS challenged.

The IRS contended that Henley could not escape the effect of § 1059 of the Code, and thereby enjoy a tax windfall upon the sale of Nucorp by the expedient of holding its Santa Fe stock in a subsidiary. Claiming that Henley had misinterpreted § 1059, the IRS sought to disregard Nucorp for tax purposes on the ground that Nucorp had no valid reason to exist other than tax avoidance. Accordingly, on March 18, 1993, the IRS issued a notice of deficiency, claiming that Henley owed additional taxes of $169 million, plus interest and penalties.

Months earlier, Henley had retained the Washington, D.C. law firm of Steptoe and Johnson ("Steptoe") to advise it in connection with the Santa Fe tax issue. In late 1991 and early 1992, Steptoe advised Abex that it had a strong tax position and that the case had a settlement value of [*13] $65 million.

During 1992 and 1993, Steptoe continued to refine its analysis as a result of an intensive investigation into the factual support for Abex's legal theories. During that process Steptoe became increasingly comfortable with Abex's tax theories, but at the same time it grew increasingly less comfortable with the evidentiary support for those arguments. The nub of Abex's tax position was that Nucorp was the true owner of the Santa Fe stock and that Nucorp had valid, non-tax-related business reasons to exist. Unfortunately, however, Steptoe discovered that significant contemporaneous documentary support for that position was lacking. n5 That, in turn, created doubts as to whether Abex could prove that Nucorp ever legally "existed" and, in fact, was the owner of the Santa Fe stock.

n5 For example, Steptoe was unable to locate adequate bank documentation of "how the money flowed" in connection with the various stock purchases made by the Henley subsidiaries. Most troubling, in Steptoe's view, was that the stockbroker who had acquired the Santa Fe shares for the Henley accounts believed that he had been working for Henley, not any of its subsidiaries.

[*14]

During the Spring of 1993, Abex decided to obtain a second legal opinion concerning its potential exposure arising out of the Santa Fe tax issue. For that purpose Abex retained Williams & Connolly, another highly prominent Washington, D.C. firm. Williams & Connolly conducted its own independent legal and factual investigation, and arrived at the same conclusion reached earlier by Steptoe: Abex's case was winnable, but its factual weaknesses

posed a significant risk. Both law firms, as well as Mr. Clifford Dirkes, Abex's Vice President responsible for tax compliance ("Dirkes"), became quite concerned that if the case were litigated, the Tax Court might reject Abex's position on the ground that § 1059 was never intended to permit the tax windfall Henley had achieved by its highly literal interpretation of the tax regulations.

In June, 1993, Abex filed a petition in the United States Tax Court, challenging the IRS's $169 million notice of deficiency. The IRS filed its answer in August, 1993. Shortly thereafter, the matter was referred to the IRS Administrative Appeals Unit ("Appeals") for settlement discussions, which began in January, 1994. Several days later the Tax Court scheduled [*15] the trial for June 20, 1994, thereby accelerating the settlement discussions.

Abex, its counsel, and Mr. Joseph Repetto, the IRS's senior Appeals conferee in its Boston office, negotiated throughout January and February, 1994. After the first meeting, Mr. Repetto, a seasoned negotiator, took a hard line. In a letter to counsel, Mr. Repetto advised Abex that he was not persuaded by its arguments, and he invited Abex to make a settlement offer. Steptoe sought authority to offer $30 million, but Abex was unwilling to authorize an offer above $20 million. The IRS rejected that offer out of hand. Mr. Repetto then made it clear that he would accept a settlement figure of no less than $44 million of additional tax, exclusive of interest. In Mr. Repetto's view, that figure represented a substantial concession from the government's initial demand that Abex pay an additional $80 to $85 million in tax to settle the matter.

At this point Steptoe advised Mr. Dirkes that (i) at least $40 million would be needed to settle the case at Mr. Repetto's level and that (ii) the settlement prospects would only get worse down the road. That advice prompted Mr. Dirkes to instruct Williams & Connolly [*16] to conduct an independent review of the matter. That was done, and Williams & Connolly advised Abex that its odds of success were slightly better than 50-50, that any settlement below $35 million should be accepted immediately, but that it would also recommend a settlement in the $40 to $45 million range. Importantly, Koll's "cap" would be exhausted under any of these recommended scenarios, because any settlement above the $30 million level would necessarily yield that result. In later negotiations Abex attempted, without success, to persuade the IRS to take less. Ultimately, Abex offered to settle at Mr. Repetto's $44 million figure which, when interest is included, amounted to an aggregate settlement of about $72 million.

Abex decided to settle for that amount because its two law firms had advised it that a settlement in that range would be reasonable and superior to any compro-

mise likely to be achieved at a later stage. Counsels' advice was, in turn, based upon their knowledge that Mr. Repetto was unaware of the factual and evidentiary weaknesses in Abex's case, and that once the IRS's trial counsel became actively involved they would quickly uncover those weaknesses. Once [*17] that occurred the government would be in a much stronger position and would likely demand far more than $44 million to settle the case. Abex's counsel credibly testified, and I find, that counsel recommended the settlement based solely on their professional view of the merits and value of the case, and without regard to how the Tax Sharing Agreements would ultimately apportion the settlement obligation among Abex, WTI, and Koll.

Abex and the IRS reached an agreement–in–principle on the settlement terms on February 23, 1994. However, the definitive documentation was not completed until March 11, 1994, when a final Stipulation of Settlement was executed by the government and received by Steptoe. Because the settlement was not final and binding on February 23, Abex was concerned that any premature disclosure of the agreement–in–principle would create a risk of insider trading that would give Abex no choice but to disclose publicly the settlement terms, even though they were not yet binding. Because such premature disclosure might jeopardize the settlement, Abex did not inform Koll or WTI of the settlement agreement until March 14, 1994—the first business day after Abex received the [*18] executed formal stipulation from the government. After its board of directors formally approved the stipulation, Abex executed and filed it with the Tax Court on March 24, 1994. At that point the settlement became final.

D. Plaintiffs' Attempt to Collect Koll's Share of the Santa Fe Tax Obligation

Throughout the settlement negotiations, Koll was kept informed of their progress, and Koll was also told that any settlement would exhaust the approximately $20 million remaining in its cap. At no time during its discussions with Abex did Koll ever object to the settlement of the Santa Fe tax issue, take the position that Abex was required to litigate that dispute to a conclusion, or contend that Abex was required to obtain Koll's consent to settle. Nor did Koll ever criticize Abex for its handling of the Santa Fe matter or accuse Abex of violating any fiduciary or contractual duties.

To the contrary, upon being informed of the settlement, Koll acknowledged—and did not dispute—its obligation to contribute its contracted–for share of the settlement amount. Koll did, however, ask Abex, and then WTI, to finance the payment of its share. Koll also issued a press release publicly disclosing [*19] its efforts to obtain such financing. However, Abex and WTI refused to finance Koll's share of the tax liability. At that point, Koll's Chief Financial Officer, Mr. Raymond J. Pacini ("Pacini"), told Abex and WTI that unless they agreed to provide financing, Koll would use the litigation process to obtain, as a practical matter, the same result.

By letter dated March 29, 1994, WTI formally demanded that Koll and Abex pay, on or before April 15, 1994, their respective shares of the Santa Fe settlement tax liability in excess of WTI's cap. WTI's letter advised that because the tax payment exceeded its (WTI's) cap by $42,413,155, that amount would have to be contributed by Abex and Koll. On April 6, 1994, Abex acknowledged its contractual obligation to indemnify Koll, and on April 15, 1994, Abex paid to WTI its $21,597,995 share of the settlement obligation.

Koll, however, refused to pay its share. In a letter from Koll's California counsel to Abex and WTI dated April 11, 1994—after the settlement stipulation had been filed with the Tax Court—Koll took the position that it had no obligation to contribute to the settlement. Koll claimed that WTI and Abex had breached contractual obligations [*20] arising out of the Tax Sharing Agreements, as well as fiduciary duties Abex owed while acting as Koll's agent in negotiating the settlement of the Santa Fe tax issue. Koll asserted that Abex (and WTI) had violated those duties (i) by settling the tax dispute without obtaining Koll's prior consent or considering Koll's interests, (ii) by excluding Koll from the settlement process, and (iii) by denying Koll's attorneys access to Steptoe and Johnson. This was the first time that Koll had taken these positions.

On April 13, 1994, plaintiffs Abex and WTI commenced this action against Koll. Two days later, after receiving Abex's contribution, WTI paid the IRS $51,374,475, representing WTI's and Abex's combined share of the settlement obligation. The approximately $20,815,000 balance, which represents Koll's share, remains unpaid, and interest on that amount continues to accrue at the rate of approximately $150,000 per month.

II. KOLL'S PRIMA FACIE LIABILITY

The core issue presented is whether Koll is liable, by virtue of the Tax Sharing Agreements, to contribute its $20,815,000 share, plus accrued interest, to the settlement of the Santa Fe tax dispute. The plain language of the [*21] Tax Sharing Agreements, and the undisputed facts to which those Agreements apply, establish beyond question that Koll is contractually liable to contribute those amounts.

Koll does not seriously contest that proposition. What Koll contends is that it has established one or more affirmative defenses that excuse it from being held contractually liable. As a consequence of Koll's position, the

Court's analysis of the parties' legal arguments divides into two parts. Part II of this Opinion discusses the contract provisions and the undisputed facts that establish Koll's prima facie liability. In Part III, infra, the Court identifies and evaluates Koll's affirmative defenses and concludes that they are wholly without merit.

* * *

There is no dispute that under the 1988 Agreement (as amended) the 1989 and 1992 Agreements, (a) any tax increase for the 1988 Tax Period must be borne by WTI up to $51 million, (b) any tax increase above WTI's $51 million "cap" must be borne by Koll up to $25 million, and (c) any increased tax liability above WTI's and Koll's combined $76 million cap must be borne by Abex. No one disputes that the Tax Sharing Agreements so provide and Koll's own Annual [*22] Report and SEC filings confirm that Koll shared that understanding of the Agreements. (See, e.g., PX 22, at 25).

It also is undisputed that for the 1988 Tax Period, the settlement of the Santa Fe tax dispute created an additional tax liability (including interest and penalties) of $72 million. That liability was to be paid by the entities comprising the consolidated group of companies formerly known as The Henley Group—Abex, WTI, and Koll—and was to be apportioned among those entities in accordance with the Tax Sharing Agreements. Thus, WTI owed (and contributed) the balance of its cap ($ 29.8 million); Koll owed (but did not contribute) the balance of its cap (approximately $20.8 million), and Abex owed (and contributed) the balance above those amounts (approximately $21.5 million).

It is further undisputed that the Tax Sharing Agreements gave Abex the power to negotiate and settle in its "sole discretion" any proceeding relating to the 1988 Tax Period. That power, as earlier noted, originally resided in Koll by virtue of § 6.01(b) of the 1988 Agreement. n6 The 1989 Agreement capped Koll's liability at $25 million and substituted Henley III as the party with potentially [*23] unlimited exposure above the combined WTI–Koll cap. n7 And, in the 1992 Agreement, Abex was substituted for Henley III as the party with the potentially unlimited liability for any tax increase, and accordingly, Abex acquired the authority, in its sole discretion, to settle any claim for additional taxes for the 1988 Tax Period. n8

n6 Section 6.01(b) provided that Koll:

shall, in its sole discretion, control and direct the conduct of . . . any tax audit or inquiry or any administrative or judicial appeal or other proceeding re-

garding any Tax Return or the payment of any Tax by the Old Henley Affiliated Group . . . Koll shall, in its sole discretion, agree to pay, settle, compromise or concede any such claim or issue arising with respect to any proceeding which it may control pursuant to this paragraph.

(PX 1A, § 6.01(b)).

n7 Under the 1989 Agreement, Henley III became the party empowered to:

Take any action . . . which [Koll] may take...pursuant to the [1988 Tax Sharing Agreement] . . . with respect to any contest affecting a Tax Item of any such entity or any amount payable or alleged to be payable under such agreements . . ..

(PX 2A, § 6.01(a)(iii)).
[*24]

n8 Section 7.01 of the 1992 Agreement provided that

For all taxable periods or portions thereof ending on or before December 31, 1988, Abex shall succeed to all of the rights and obligations of [Henley III] described in Article VI of the [1989 Tax Sharing Agreement] relating to the conduct of any audit or other proceedings with respect to Taxes . . ..

(PX 3A, § 7.01(a)).

Applied to the undisputed facts, those provisions clearly establish Koll's prima facie contractual obligation to contribute the balance of its "cap" towards the additional tax obligation flowing from the Santa Fe tax issue settlement. Therefore, unless Koll has established one or more affirmative defenses that would excuse it from liability, Koll is liable to the plaintiffs for that amount. Because Koll claims that it has established such defenses, it is necessary for the Court to address them. To that subject the remainder of this Opinion is primarily devoted.

III. KOLL'S AFFIRMATIVE DEFENSES

A. Koll's Position Summarized

Koll has interposed a plethora of defenses that (it claims) excuse it from liability altogether [*25] or, at a minimum, preclude this Court from awarding money damages (as opposed to declaratory) relief. Koll's defenses take on a variety of different forms, but at their core is the argument that in the course of negotiating and concluding the settlement of the Santa Fe tax dispute, Abex violated certain duties owed to Koll. Because Koll's position is presented in somewhat diffuse fashion, it is not easily summarized. However, as best as I can discern, Koll contends that Abex violated three primary duties: (1) a duty to disclose to, and consult with, Koll regarding the status of the settlement of the tax dispute and any proposed course of action; (2) a duty not to conclude a settlement without Koll's prior consent; and (3) alternatively (is, assuming Koll's prior consent was not required), a duty not to settle except on terms consistent with Koll's interests, which (Koll says) were either to litigate the tax claim to a conclusion or to settle that claim on terms that would require no payment by Koll until after 1995.

These duties are claimed to flow from one or more of the following sources: (a) the express terms of the Tax Sharing Agreements, (b) Abex's implied obligation to perform [*26] those Agreements in good faith, (c) Abex's status as Koll's agent, and (d) Abex's status as Koll's fiduciary. Koll also urges that these and other claimed breaches of duty establish the defense of unclean hands that bars the plaintiffs from relief in equity.

Alternatively, Koll argues that even if it is found contractually liable, this Court may grant only declaratory relief, because the amount of Koll's tax liability is disputed and the Tax Sharing Agreements require that such disputes be resolved by arbitration. Finally, Koll argues that the plaintiffs have not established their entitlement to either prejudgment interest or an award of attorneys' fees and expenses.

The plaintiffs vigorously dispute Koll's position. Plaintiffs contend that Abex was neither Koll's agent nor its fiduciary, that the relationship between these parties was purely commercial and defined solely by contract, and that none of the "duties" Koll asserts find expression in (and in many cases are expressly negated by) the Tax Sharing Agreements. Plaintiffs also argue that to the extent they owed express or implied contractual duties to Koll, they fully discharged those duties, and engaged in no inequitable conduct. [*27] Finally, the plaintiffs argue that Koll has refused to honor its contractual obligations, and has asserted its affirmative defenses in bad faith. For that reason, plaintiffs claim that Koll should be precluded from relying upon the arbitration remedy as a defense and should be required to pay plaintiffs' attorneys' fees.

Because Koll's liability depends entirely on the valid-

ity of its affirmative defenses, I now address them. In Part III B of this Opinion, I consider Koll's contractual arguments and find that Abex violated no contractual duty, express or implied. In Part III C, I address Koll's contention that Abex violated duties it owed as Koll's agent and fiduciary, and conclude that Abex violated no such duties because it was neither an agent nor a fiduciary of Koll. In Part III D, I consider—and reject—Koll's affirmative defense of unclean hands. Finally, in Part IV, I consider the appropriate remedy, including whether the money damage issue must be arbitrated and whether Koll should be required to pay the plaintiffs' attorneys fees and expenses. All those issues are resolved in favor of the plaintiffs.

B. Koll's Breach-of-Contract Defenses

1. Preliminary

Any discussion [*28] of Koll's contractual defenses must begin by recognizing that they rest upon propositions that are nowhere expressed in, and in many cases are negated by, the Tax Sharing Agreements. In essence, Abex is accused of violating its contract obligations by settling the Santa Fe tax dispute without having first consulted with Koll or obtained its prior consent. However, the pertinent Agreements expressly conferred upon Abex the right "in its sole discretion," to settle, and to "control and direct the conduct" of "any proceeding" relating to the 1988 Tax Period. (PX 1A, § 6.01(b); PX 3A, § 7.01(a)). Koll does not dispute that the Agreements so provide (Koll Br. at 5), and it concedes that the Agreements do not expressly require Abex to consult with Koll or obtain Koll's consent before settling any such proceeding with respect to the 1988 Tax Period.

That concession is dispositively critical, because the Agreements do expressly confer such prior consultation and veto rights upon Koll with respect to post-1988 Tax periods. Section 6.01(b) of the 1989 Agreement provides, with respect to such periods, that:

> Henley [III] shall (i) provide [Koll] and its counsel with copies of [*29] all correspondence, notices and other documents received by Henley [III] in connection with any such audit, inquiry, appeal or other proceeding; (ii) permit [Koll] and its counsel to review any materials to be submitted by Henley [III] to any government or taxing authority in connection with such audit, inquiry, appeal or proceeding; (iii) consult with [Koll] and its counsel regarding any position that [Koll] intends to take regarding any issue raised during the course of any such audit, inquiry, appeal or other proceeding; and (iv) afford

[Koll] and its counsel the right to participate in the conduct of any such audit, inquiry, appeal or other proceeding, including, without limitation, the right to participate in conferences with tax authorities.

(PX 2A, § 6.01(b)).

And § 7.01(b) of the 1992 Agreement states, with respect to post-1988 periods, that:

> Notwithstanding anything to the contrary herein, Henley [III] shall not pay, settle, compromise or concede, and shall cause not to be paid; settled, compromised or conceded . . . any claim . . . that would adjust any Tax Item of the Abex Businesses, for which Abex could be held liable under Article V hereof, without the express [*30] written consent of Abex (which shall not be unreasonably withheld).

(PX 3A, § 7.01(b)).

Thus, the parties to the Tax Sharing Agreements (a) expressly intended to—and did—confer participation and consent rights upon Koll for post-1988 tax periods, but (b) did not intend to confer such rights for the 1988 Tax Period—the only period in dispute here. The clear and inescapable conclusion is that the contracting parties did not agree to require Abex to consult with Koll, or allow Koll to participate in the tax proceedings, or to obtain Koll's prior consent, as a condition to settling the Santa Fe tax dispute.

Koll insists, nonetheless, that even though such duties find no expression in specific contract language, they are derivable and should be implied from other provisions of the Agreements (specifically, the so-called "diligence and care" and "duty of cooperation" clauses), as well as from the implied covenant of good faith and fair dealing. For the reasons now discussed, that argument has no merit whatsoever.

2. The "Diligence and Care" and "Duty of Cooperation" Argument

Koll attempts to derive a contractual duty from § 6.01(a) of the 1989 Agreement, which provides that: [*31]

> [Abex] shall undertake any such action which affects a Tax Item of or amount payable by or to any entity other than [an Abex business] . . . with the same diligence and care as if such action pertained to a Tax Item [of an Abex

business], and as if any amount which might be payable by or to any entity other than [an Abex business] with respect to such contest were payable by or to [Abex].

(PX 2 and 2A, § 6.01(a)).

According to Koll, the quoted language required Abex to evaluate any potential settlement "as though it were Koll." By failing to consider Koll's interests—which were either not to settle at all or to settle under circumstances that would require no payment before 1995 (so the argument goes)—Abex breached that contractual duty.

The problem with Koll's argument is that it is ipse dixit. Nothing in the quoted contract language requires Abex to assess any potential settlement from Koll's unique perspective. All the contract requires is that Abex evaluate the settlement as if Abex would be responsible for the entire payment. Expressed in terms of this case, in deciding whether to settle the Santa Fe tax dispute, Abex was obligated to exercise the same degree [*32] of care and prudence it would employ if it were paying the entire $72 million tax payment out of its own pocket. The record overwhelmingly demonstrates, and I conclude, that Abex did precisely that.

The IRS had claimed a tax deficiency of $169 million, exclusive of interest and penalties. Abex settled that tax claim for $44 million. Abex agreed to that settlement on the advice of its two highly expert law firms, and even then only after hard arm's-length bargaining. Tax counsel had advised Abex that while they felt comfortable with Abex's legal theory, they were concerned that the facts required to support it could not be proved. Counsel were also concerned, and advised Abex, that the Tax Court might reject Abex's technical position because it would result in a tax windfall that violated the intent of the very tax regulations upon which Abex was relying. Counsel also advised Abex that at least $40 million would be needed to settle the case at the Appeals conference level, and that once the government uncovered the factual weaknesses in Abex's case, the settlement value would go up from there.

Against its counsel's advice, Abex made an initial settlement offer of $20 million, [*33] which the government rejected out of hand. Ultimately, both firms recommended a settlement at any level below $50 million, and attorneys from both of Abex's law firms persuasively testified that they recommended the $44 million settlement as reasonable. There is no credible evidence to the contrary. Plaintiffs' trial counsel also testified, and the evidence is uncontroverted, that in recommending that compromise, counsel based their professional evaluation of the issue solely upon the provable merits of Abex's position, and they did not consider the fact that WTI and Koll would

also be contributing to the settlement.

Koll next asserts that Abex violated the "cooperation" clause of the Agreements, which pertinently states:

> [Koll] and [Abex] will . . . provide each other with such cooperation and information as either of them reasonably may request of the other . . . in conducting any audit or other proceeding in respect of Taxes.

(PX 2A, § 6.02). Koll argues that Abex breached its "duty of cooperation" by denying its counsel access to Steptoe and by failing to keep Koll informed on the details of the settlement negotiations.

That argument is fatally flawed. It has no merit [*34] legally, because the "cooperation clause" on its face runs in favor of the party conducting the audit or the litigation—here, Abex. Koll offers no cogent argument to show why (as it contends), the duty ran the opposite way.

The argument has no merit factually, because even if Abex owed a duty of cooperation to Koll, that duty was fully observed. The record is replete with undisputed evidence that Abex's representatives had numerous meetings and discussions with Koll's representatives, including Koll's lawyers and auditors, to update them on the status of the settlement negotiations. A partner of Koll's accounting firm, Deloitte & Touche, testified that he never asked for any information from Abex that was not provided. Koll was able to point to only one contrary instance, in February, 1994, when a Koll representative asked Abex if he could speak to Steptoe and was told to wait a few weeks. That conversation took place during a highly critical point in the settlement negotiations, when Abex was sensitive to the need to avoid public disclosure of the settlement until it had become finalized. It is undisputed that Koll had never asked before, and never asked again, for access to Steptoe, [*35] nor did it ever ask to speak with Abex's other law firm, Williams & Connolly.

I conclude that Abex violated no duty arising under any express term of the Tax Sharing Agreements.

3. The Implied "Good Faith" Obligation

Unable to establish a violation of any express contractual duty, Koll next contends that by failing to consult with Koll and obtain its prior consent to the settlement, Abex violated its implied duty to perform the Tax Sharing Agreements in good faith. That argument also has no legal or factual support.

Koll claims that Abex violated an implied obligation to act in good faith by not considering how the Santa Fe settlement would impact Koll's interests. The short answer is that no such duty existed. Delaware, like most jurisdictions, recognizes an implied covenant that each party to a contract will act with good faith towards the other with respect to the subject matter of the contract. *Katz v. Oak Industries, Inc., Del. Ch., 508 A.2d 873, 880 (1986)*. However, courts will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong. Elliott Assocs., L.P. v. Bio-Response, Inc., [*36] Del. Ch., C.A. No. 10624, Berger, V.C., mem. op., at 12 (May 23, 1989); Shenandoah Life Ins. Co. v. Valero Energy Corp., Del. Ch., C.A. No. 9032, Allen, C., mem. op., at 21–22 (June 21, 1988); cf. Williams Natural Gas Company v. Amoco Production Company, Del. Ch., C.A. No. 11040, Jacobs, V.C., mem. op., at 19 (April 16, 1991). Here, the Agreements expressly required only that Abex evaluate the settlement as if it would be paying the entire amount. The Agreements did not require Abex to consider Koll's idiosyncratic interests; on the contrary, they gave Abex the "sole discretion" to settle. The Court will not rewrite the parties' agreement by implying a duty that the parties themselves expressly contracted not to create.

Second, Koll contends that Abex violated its implied duty of good faith by breaching its "duty of candor," in particular, by not keeping Koll apprised of the true status of the settlement negotiations, and thereby misleading Koll to believe that the case would be litigated to a conclusion. That argument has no record support.

As early as May, 1993, Abex advised Koll of the possibility that the matter could be settled, and that a reasonable settlement would be [*37] in a range of $60 to $70 million, including interest. That information was consistent with what Koll's auditor had communicated to Mr. Pacini a few months earlier. In November, 1993, Abex informed Koll that a reasonable settlement amount would be in the range of $40 million in additional tax, that the case would be referred to the IRS Appeals Unit for settlement discussions in December, 1993 or January, 1994, and that any settlement would likely exhaust Koll's cap. At that time Abex informed Koll that it intended to settle if a settlement could be reached on reasonable terms. When settlement negotiations began, Abex immediately informed Koll, and after the Tax Court had set a trial date, Abex's Mr. Dirkes told Koll's Mr. Pacini that the negotiations were "accelerating."

Finally, when the settlement negotiations reached a critical stage, Mr. Dirkes informed both Mr. Pacini and Koll's tax counsel that although he could not share specific details about the amounts under discussion because of securities law concerns, he could confirm that the amounts being discussed would exhaust Koll's cap. In response to that information Koll, assisted by its auditors, drafted

language for inclusion [*38] in its Form 10–K to reflect that the balance of its $25 million tax sharing liability would likely come due in 1994. Koll did not dispute its prospective tax liability or in any way complain of how Abex was handling the matter.

Thus, Koll's suggestion that Abex misled it into believing that the case would be litigated to a conclusion is belied by the uncontroverted record. n9

> n9 Koll complains that Abex did not disclose all "the details" of Abex's communications with its attorneys at Steptoe. Abex had no contractual duty to do so. The Agreements afforded Koll consultation and participation rights only for post-1988 tax periods.
>
> Of the same piece is Koll's claim that Abex violated its implied good faith duty by failing to disclose that Abex had settled the Santa Fe tax case solely on the basis of Abex's own financial concerns. The short answer is that that argument restates, in different form, Koll's previously-rejected contention that Abex was obligated to decide whether or not to settle solely from the standpoint of Koll's best interests. Moreover, the uncontroverted record establishes that Abex agreed to the settlement in reliance upon the advice of its counsel, and because the settlement terms were reasonable in the circumstances.

[*39]

Finally, Koll argues that Abex breached its duty of candor when Mr. Dirkes, in a February 23, 1994, telephone conversation with Koll's counsel, Mr. Bolding, did not disclose that an agreement–in–principle had been reached with the IRS. The record does not establish that the telephone conversation took place on or after February 23, 1994, and on cross examination Mr. Bolding conceded that he had no independent recollection of when the call occurred. Even if the call did take place on or after February 23, that fact establishes no violation of duty, because Abex was not contractually required to tell Koll of the agreement–in–principle the moment it occurred. In addition, Abex had valid reasons (concern about preventing insider trading) for not doing so, and it did inform Koll and WTI of the settlement the next business day after it received the finalized stipulation. Koll's present position that it should have been told earlier is wholly inconsistent with its pre-litigation reaction when it did learn of the settlement: Koll did not object to the settlement and it requested financing to pay its share.

C. Koll's Agency and Fiduciary Defenses

Apart from its contractual arguments, [*40] Koll also contends that Abex was required to obtain Koll's prior consent to the settlement by virtue of its independent status as Koll's agent or fiduciary. That argument must be rejected because Abex was neither an agent nor a fiduciary of Koll.

1. The Claimed Agency Relationship

Critical to an agency relationship is the power of the principal to direct and control the agent. *Billops v. Magness Constr. Co., Del. Supr., 391 A.2d 196, 197–8 (1978); Meese v. Miller, App. Div. 4th Dept., 79 A.D.2d 237, 436 N.Y.S. 2d 496, 499 (1981); RESTATEMENT (SECOND) OF AGENCY § 14* (1958). When the existence of an agency relationship is in dispute, the courts normally will look to the right to control as the critical factor. *Maritime Ventures Int'l. Inc v. Caribbean Trading & Fidelity, Ltd., S.D.N.Y., 689 F. Supp. 1340, 1353 (1988).* The burden rests upon the party asserting the existence of an agency relationship to prove it. *Facciolo v. State Division of Revenue, Del. Supr., 358 A.2d 880, 881 (1976).*

Nothing in the Tax Sharing Agreements or in the parties' conduct establishes any agreement [*41] by Abex to be Koll's agent or in any way to be subject to Koll's control. To the contrary, (i) the Agreements establish the opposite intent, (ii) the parties' course of dealing shows that Koll never considered Abex to be its agent with respect to the 1988 Tax Period, and (iii) there is no evidence that Koll ever attempted to exercise any control over Abex. That, in my view, disposes of Koll's agency argument.

Nonetheless, Koll insists, and proffers various reasons why, an agency relationship should be deemed to have arisen. First, Koll contends that Abex implicitly agreed to act as Koll's attorney-in-fact, by virtue of a provision in the Tax Sharing Agreements that required Abex to execute and deliver any power of attorney that Koll requested. However, there is no evidence that Abex ever requested Abex to execute or deliver a written power of attorney, and it is undisputed that none was ever given.

Second, Koll argues that Abex's right to exercise "sole discretion" was constrained by other provisions of the Agreements that (Koll says) implicitly empowered Koll to control and direct Abex. One such provision is said to be the "cooperation clause," but, as previously found, the duty [*42] of cooperation runs in favor of the party controlling the tax audit or proceeding. See Part III B(2), supra. For the 1988 Tax Period (the only period relevant here), the party to whom that duty was owed was Abex, not Koll.

Third, Koll relies upon the "diligence and care" provision. However, as previously found, that clause required only that in exercising its sole discretion, Abex act pru-

dently and make decisions regarding the conduct or settlement of any tax dispute as if it would be bearing all the financial consequences of those decisions. Id. Abex did that.

Fourth, Koll points to a Tax Sharing Agreements provision that required Abex to act on behalf of the consolidated group's members (including Koll and WTI) in responding to any tax audit and related litigation. (PX 1A, § 6.01(b); PX 2A, § 6.01(a)(iii); PX 3A, § 7.01(a)). But the fact that a person acts in the name of another does not, without more, make that person an agent. To be an agent, one must have been appointed by the principal and be subject to the principal's orders. *RESTATEMENT (SECOND) OF AGENCY §§ 1* and 14. Neither this nor any other provision of the Agreements makes Abex subject to Koll's orders. [*43]

Finally, Koll argues that, independent of the Tax Sharing Agreements, an agency relationship was created by *§ 1.1502-77(a) of the United States Treasury Regulations*, which pertinently states that:

> the common parent . . . shall be the sole agent for each subsidiary in the group, duly authorized to act in its own name in all matters relating to the tax liability for the consolidated return year. . . . No subsidiary shall have authority to act for or to represent itself in any such matter. . . .

Koll is wrong. The only purpose and effect of that Regulation is to make the parent of a consolidated group the agent of its subsidiaries, as a matter of procedural convenience to the federal government, so that the IRS will not have to deal with all of the group's members or inquire into the parent's actual authority to bind the others. *In re Bob Richards Chrysler-Plymouth Corp, 9th Cir., 473 F.2d 262, 265,* cert. denied, *412 U.S. 919 (1973); Capital Bancshares, Inc. v. Federal Deposit Ins. Co., 5th Cir., 957 F.2d 203, 207,* (1992). The Regulation does not create or impose an agency relationship [*44] between the parent and the other members of a consolidated group for any other purpose. *Jump v. Manchester Life & Cas. Mgt. Corp., 8th Cir., 579 F.2d 449, 452,* (1978). Most important, and as Koll admits, n10 the Regulation does not in any way supersede or affect the ability of the members of the group to allocate the ultimate tax liability among themselves by contract. *Bob Richards, 473 F.2d at 264;* see also *In Re Franklin Savs. Corp. 159 B.R. 9, 29 (Bankr. D. Kan. 1993).*

n10 Koll admits that the Regulation does not purport to regulate the relationship of the members of the consolidated group inter sese and that the

"group's members are . . . free to allocate the potential tax deficiencies . . . among themselves, as that issue is not addressed in the Internal Revenue Code and is therefore governed by state law." (Def. Br. at 11).

The Regulation cannot, therefore, be a basis to imply an agency relationship between Abex [*45] and Koll that contravenes or supersedes the express terms of the Tax Sharing Agreements.

2. The Claimed Fiduciary Relationship

Next, Koll argues that even if Abex's unfettered power to control the conduct and settlement of 1988 Tax Period-related proceedings did not create an agency relationship, it did make Abex a fiduciary of Koll. As a result, Koll argues, Abex assumed fiduciary obligations, including the duty to obtain Koll's prior consent to settle the Santa Fe tax case. This argument fails as a matter of law because Abex's contractual right to control the tax litigation did not make Abex Koll's fiduciary. The contractually-created relationship between Abex and Koll was akin to that of insurer and insured, not to that of fiduciary and beneficiary.

In *Corrado Bros. Inc. v. Twin City Fire Ins. Co., Del Supr., 562 A.2d 1188, 1192 (1989),* an insurer sued its insured to recover a retrospective premium on a workmen's compensation insurance policy. The insured argued that it did not lawfully owe the retrospective premium, which was based upon a settlement that the insurer had concluded without the insured's prior consent. The insurance contract (like [*46] the Tax Sharing Agreements here) expressly gave the insurer the sole authority to settle any claim without the prior consent or participation of the insured. Despite that, the insured argued that the insurer had a fiduciary duty to obtain the insured's consent to settle, because the amount the insurer had committed to pay in settlement would ultimately have to be paid by the insured in the form of a retrospective premium adjustment.

Rejecting that argument, the Supreme Court held that while the exclusive contractual power to settle a claim imposed upon the insurer a duty to demonstrate that its settlement decision was reasonable and in good faith, that power did not make the insurer a fiduciary or impose a fiduciary obligation to obtain the insured's prior consent to the settlement:

> The concept of a fiduciary relationship, which derives from the law of trusts, is more aptly applied in legal relationships where the interests of the fiduciary and the beneficiary incline toward a common goal and in which

the fiduciary is required to pursue solely the interests of the beneficiary in the property. . . . The relationship of insurer and insured, however, arises contractually with each [*47] party reserving certain rights under the contract, the resolution of which often leads to litigation. Thus, the settlement of a claim may benefit the insurer to the extent that it eliminates or reduces the cost of contesting the claim through litigation. The settlement may, however, prejudice the interests of the insured to the extent that settlement may result in an increase in future premiums or represent a tacit admission of liability. This expected clash of interests is clearly not compatible with the concept of a fiduciary.

*562 A.2d at 1192* (citation omitted). That reasoning, and result, apply equally here. n11

n11 Koll cites New York decisions to support its position that New York law controls and compels a finding that Abex was a fiduciary. Koll is mistaken. The contracts that grant Abex sole discretion and establish the rights and duties of the parties with respect to the 1988 Tax Period are the 1988 and 1989 Agreements, both of which contain Delaware choice of law provisions. Koll's reliance upon the 1992 Agreement (which contains a New York choice of law provision) is misplaced, because that Agreement merely assigned to Abex Henley III's rights and duties, all of which arose out of the 1988 and 1989 Agreements. (Henley III later became a subsidiary of Koll, but was not a subsidiary at the time of the 1992 Agreement.) Accordingly, the fiduciary issue is controlled by Delaware law.

[*48]

Like the insurance contract in Corrado Bros., the Tax Sharing Agreements here did not require Abex to "pursue solely the interests" of Koll. Id. (emphasis added). Quite the contrary, the Agreements recognize that Abex's and Koll's interests were inherently in conflict, and were specifically designed to manage those conflicts, all of which arose out of the parties' differing economic and financial interests. n12 The parties' contractual arrangement, by its very nature, lacks the essential elements of a fiduciary relationship and is antithetical to it. n13 Abex's contractual power to control exclusively 1988 Tax Period proceedings was never intended to create a fiduciary relationship that would require Abex to obtain Koll's prior consent to the Santa Fe tax settlement. Under Corrado Bros., that power and the parties' divergent in-

terests would, at most, have imposed upon Abex the obligation to demonstrate that its settlement decision was reasonable and made in good faith. As previously found, Abex has so demonstrated.

n12 Accordingly, Koll should not have been surprised that when it became necessary for Abex to negotiate with the IRS over the Santa Fe tax matter, Koll and Abex had identifiably distinct interests regarding the outcome of those negotiations. Because Koll lacked liquidity and desired to utilize its resources to complete the development of its real estate projects, Koll's interest was (i) for Abex to litigate fully the Santa Fe tax case and postpone any obligation of Koll to contribute to a settlement until after 1995, and (ii) failing that, to settle for an amount that would require little or no contribution by Koll. By contrast, because of its potentially unlimited exposure to tax liability above the combined WTI/Koll "cap," Abex's interest was (i) to settle as soon as possible to minimize that exposure, particularly by avoiding a trial that would expose the weaknesses of its case, and (ii) to settle at a level that would minimize Abex's contribution, even though the result might be a settlement that would exhaust Koll's (and WTI's) "cap."

[*49]

n13 Thus, the Tax Sharing Agreements established a contractual relationship under which Abex assumed potentially unlimited liability for tax assessments stemming from the 1988 Tax Period, while Koll's liability was limited to $25 million. In return, Koll gave to Abex the authority to exercise its "sole discretion" in matters arising out of the 1988 Tax Period.

Koll also argues that Abex should be deemed Koll's fiduciary, because Abex's management (which until 1993 was common to both Abex and Koll) drafted all three Agreements and "unilaterally imposed" them on Koll. That contention is dispositively answered by *Anadarko Petroleum Corp. v. Panhandle Eastern Corp., Del. Supr., 545 A.2d 1171 (1988),* which holds that in preparing contracts between itself and a wholly owned subsidiary in anticipation of a spinoff, a corporate parent owes no fiduciary duty to the subsidiary. *Id. at 1174-77.* Nor did the fact that Koll and Abex once shared common senior management give rise to any fiduciary duty. Management did owe fiduciary duties to both entities, [*50] but the duties owed by management did not give rise to a fiduciary duty running from one entity (Abex) to the other (Koll).

Conceptually, those two categories of duties are separate and distinct. n14

> n14 The argument is also factually irrelevant, because the conduct claimed to constitute the breach of duty—the settlement of the Santa Fe tax dispute—occurred long after the Abex officers who implemented that decision had resigned their positions at Koll.

Equally unpersuasive is Koll's argument that a fiduciary obligation should be implied under the law governing relationships between parent and subsidiary corporations. Factually, that argument goes nowhere because Abex was not Koll's parent at the time of the alleged fiduciary breach viz., the settlement with the IRS. Legally, the contention is incorrect because neither Abex nor its predecessors owed any fiduciary duty to Koll or its predecessors at the time the Tax Sharing Agreements were entered into. Where a parent corporation contracts with its wholly owned [*51] subsidiary (as occurred here), the "entire fairness" mode of analysis is inapplicable. Under Anadarko, the only relevant inquiry is whether the contract is in the best interests of the parent and its shareholders. *545 A.2d at 1197.*

Finally, Koll argues that its reliance upon Abex to resolve the Santa Fe tax issue justifies imposing fiduciary duties upon Abex in favor of Koll. But Koll presents no law, fact, or reason why that should be so. Koll was advised throughout by highly competent and independent tax counsel and tax advisors (Deloitte & Touche), who reviewed the Santa Fe tax issues with Abex on an ongoing basis. Legally, Koll and Abex had only a commercial relationship, arising out of contract, which was at arm's-length and involved no element of confidentiality or joint undertaking. Where (as here) there exists no "special" relationship of trust, there is no reason or basis to imply fiduciary duties that would be inconsistent with duties expressly created under the Tax Sharing Agreements. See *McMahon v. New Castle Associates, Del. Ch., 532 A.2d 601, 605 (1987).*

\* \* \*

Because Abex was neither Koll's agent or fiduciary, [*52] it owed no duties to Koll other than those arising from the Tax Sharing Agreements, all of which Abex fully discharged.

D. The Unclean Hands Defense

Lastly, Koll argues that Abex engaged in inequitable conduct amounting to "unclean hands" that bars it from obtaining relief in equity. That conduct is said to include (i) the decision to allocate $25 million of the potential

tax liability to Koll, (ii) Abex's demand that Koll pay its share of the settlement when it "knew" that Koll would be unable to write a $21 million check because of liquidity problems, and (iii) Abex's inducing Koll to relinquish a "put option" in August, 1993, by representing that Koll would not be expected to contribute to any tax settlement until at least 1995, if ever. (Def. Br. at 29-32.) None of these arguments has the slightest merit.

Koll's first argument has no legal or evidentiary support. As previously noted, the decision to cap Koll's liability at $25 million was made when Koll was part of the Henley consolidated group. Accordingly, Anadarko precludes the "fairness" inquiry upon which that argument rests. Moreover, Koll cites no evidence that the allocation to it of the $25 million tax liability [*53] was unfair. Any fairness inquiry would have to review the overall allocation of assets and liabilities to Koll in all three spinoff transactions. Those transactions resulted in Koll receiving significant assets, and relief from other liabilities, of the consolidated group. Koll's current management were aware of Koll's principal assets and liabilities when they assumed control in 1993, and did not complain of the allocation at that time. Only now that the time has arrived for Koll to pay one of those liabilities does Koll claim that the allocation is unfair. A most telling commentary on Koll's position is that Koll seeks to divest itself of only one of its allocated liabilities, yet does not offer to give up any of the significant assets or other benefits it also received.

Nor is there support for Koll's argument that Abex "knew" that Koll would be unable to write a check for $21 million. Even if that were true, Koll offers no reasoned explanation of why Abex's attempt to collect a lawful debt is "inequitable." Moreover, at no time before the settlement did Koll ever claim that it could not pay its contractually obligated share; indeed, Koll always carried a reserve on its books [*54] for the entire $25 million potential liability. Koll's 1993 annual report discloses that it had more cash on hand in December 1993 than during each of the previous four years. And in a letter to the Court dated April 20, 1994, Koll's counsel specifically represented that Koll had sufficient funds on hand to pay the $20.8 million obligation.

Finally, no facts support Koll's argument that it agreed to terminate its "put option" in August, 1993, in reliance upon Abex's misrepresentation that Koll would not be required to contribute to any settlement before 1995. Abex made no such representation. At trial, Mr. Pacini conceded that the termination of the option was negotiated at arm's length, in exchange for a cash payment to Koll of $3 million plus the cancellation of $500,000 of Koll's indebtedness to Abex. Even though he knew that Abex

... 

could settle the tax case at any time, Mr. Pacini recommended that deal to Koll's board of directors because he believed that it would serve Koll's best interests.

## IV. ISSUES RELATING TO REMEDY

The foregoing determinations lead inexorably to the declaratory relief that plaintiffs request. The plaintiffs have established, and the Court determines [*55] and declares, that: (1) the plaintiffs violated no duty of any kind owed to Koll; (2) Koll is in breach of the Tax Sharing Agreements and has established no defense that would relieve or excuse it from being held liable thereunder; and (3) therefore, Koll is liable to the plaintiffs for its share of the Santa Fe tax settlement in accordance with the Tax Sharing Agreements. n15

> n15 Koll also argues that because WTI has not yet paid Koll's $20.8 million share of the tax liability to the IRS, no contractual obligation has yet "matured." There is no basis in fact or law for that argument. Nothing an the Agreements, or in any authority cited by Koll, makes payment by WTI or Abex of Koll's share a condition precedent to the maturing of Koll's contractual obligation. Koll's contractual liability has accrued, and if it remains unpaid the IRS will seek to recover the amount due. In every legal and practical sense, Koll's liability matured on April 15, 1994.

That determination does not, however, end the matter, because the [*56] plaintiffs also seek a money judgment against Koll in the amount of $20,815,000, plus prejudgment interest and an award of their litigation costs, including attorneys' fees. Koll opposes these requests, insisting that the Tax Sharing Agreements require that any disputes over the specific amount of its liability be resolved in arbitration, and that no justification has been shown to award prejudgment interest or attorneys' fees.

These colliding positions raise the following questions: (1) Must the amount of the plaintiffs' recovery be submitted to arbitration or can it be determined in this action? (2) Are plaintiffs' entitled to prejudgment interest? and (3) Are plaintiffs' entitled to a discretionary award of attorneys' fees? The answers, and my reasoning, are now set forth.

### A. The Arbitration Issue

Koll takes the position that this Court can neither determine nor enter a money judgment for the specific amount owed by Koll, because the Tax Sharing Agreements require that disputes as to "accounting matters" be submitted to a "nationally recognized public accounting firm" for arbitration. (PX 1 and 1A, § 8.03; PX

2 and 2A, § 7.03).

Plaintiffs proffer various reasons why Koll is [*57] not entitled to arbitrate the specific amount of its liability, including that the arbitration provision does not apply and that Koll has waived its right to seek arbitration. I need not consider these arguments, however, because the record clearly establishes that (i) there is no "dispute" regarding the amount of Koll's liability that requires resolution, and (ii) Koll is attempting to contrive a dispute as a pretext to invoke the contractual arbitration remedy for the sole purpose of delaying a judicial determination of its clear contractual obligation.

Because it is undisputed that the Santa Fe tax settlement would exhaust the cap on Koll's contractual liability for the 1988 Tax Period, the only arguable issue relating to the "amount" of Koll's liability concerns the balance remaining in its cap. But no bona fide dispute exists concerning that issue.

Beginning in the fall of 1993, Abex periodically sent to Koll memoranda showing that the balance of Koll's cap had been calculated at $20,815,000. The latest memorandum was dated March 18, 1994. In the past if Mr. Pacini reviewed Abex's cap calculations and found an error, he would bring the error to Abex's attention and it would [*58] be corrected. However, at no time after reviewing the March 18, 1994 cap computation did Mr. Pacini or anyone else at Abex challenge the cap calculation, request documentary "backup" for it, or seek an informal resolution consistent with past practice. On the contrary, after Koll's counsel sent its April, 1994 letter to Abex denying liability (which caused Abex to file this lawsuit), Mr. Pacini submitted to this Court an affidavit attesting that Abex had "not completed [its] review of the alleged $20.8 million calculation." The clear implication was that this calculation was disputed and that Koll was making a bona fide effort to ascertain the correct number.

Mr. Pacini's trial testimony proved that affidavit to be false, or, at best, misleading. 'When asked if he disputed the $20.8 million figure, Mr. Pacini would not answer in the affirmative, stating only that "I think we need more time to review it." (Pacini Tr. 388–89.) However, when pressed, Mr. Pacini admitted that he did not know one way or the other whether the cap calculation was right or wrong (id.), that he had made a deliberate choice not to find out (id. at 389) and that he had specifically declined to agree [*59] to Abex's calculation in the hope of forcing an arbitration (id. at 386), which, he hoped, would begin after the conclusion of this litigation. (Id. at 387.)

The record clearly shows that there is no bona fide dispute as to the amount owed by Koll. Rather, Koll is attempting to contrive a dispute as a pretext to invoke

the arbitration procedure in order to delay payment of its clear contractual obligation. That Koll has never initiated arbitration is further evidence (if any were needed) that Koll has raised the arbitration defense in bad faith and as part of a broader strategy of causing delay by forcing the plaintiffs to resort to litigation to enforce a clear contractual right. See Part IV C, infra.

Koll will not be heard to advance the arbitration defense in bad faith. Accordingly, a money judgment will also be entered in favor of plaintiffs, and against Koll, in the amount of $20,815,000.

B. Prejudgment Interest

In Delaware, prejudgment interest is awarded as a matter or right and is to be computed from the date payment is due. *Citadel Holding Corp. v. Roven, Del. Supr., 603 A.2d 818, 826 (1992).* Here, it is undisputed that [*60] Koll's payment was due April 15, 1994, and that since then interest has accrued on the $20,815,000 debt. The IRS will claim—and receive—interest from April 15, 1994 to the date of payment. Just as Koll is obligated to pay the $20,815,000, so also it would be liable to pay any interest due on its share at the rate required under federal law.

Accordingly, Abex shall be entitled, as part of its money judgment against Koll, to prejudgment interest beginning as of April 15, 1994, at the rate required to be paid to the IRS under applicable federal law. n16

n16 It is unclear whether the interest calculation set forth in PX 252 is based upon the applicable federal interest rate. If it is, then the judgment will embody that calculation. In any event, Koll's objection to that calculation is rejected as amounting to unsupported post-trial criticism of the accuracy of plaintiffs' calculation, which should have been advanced at the trial and supported by evidence introduced at that time. Had that been done, the plaintiffs would have had the opportunity to respond and develop an appropriate record.

Koll's other objections to prejudgment interest are based on the already-rejected premise that the dispute as to amount must be arbitrated. See Part IV A., supra.

[*61]

C. Plaintiffs' Entitlement to Attorneys' Fees

The final question is whether the plaintiffs are entitled to an award of attorneys' fees. For the following reasons, I conclude that they are.

Under the American Rule, each party must bear its own litigation expenses, including attorneys' fees. *Tandycrafts, Inc. v. Initio Partners, Del. Supr., 562 A.2d 1162, 1164 (1989).* However, this Court has the power to award attorneys' fees where the party against whom the fees are assessed has acted, inter alia, in bad faith or vexatiously. Judge v. City of Rehoboth Beach, Del. Ch., C.A. No. 1613, Chandler, V.C., mem. op. at 4 (April 29, 1994). A determination of "bad faith" is necessarily a fact-intensive inquiry. Actions by a defendant which necessitate judicial intervention to secure a clearly defined and established right, are evidence of bad faith. So also are actions by a defendant designed to force an opposing party to resort to litigation for the purpose of causing unreasonable delay. *Inlet Assoc. v. Harrison Inn Inlet, Inc., Md. App., 324 Md. 254, 596 A.2d 1049, 1056 (1991)* (citing *Roadway Exp., Inc. v. Piper, 447 U.S. 752, 766, 65 L. Ed. 2d 488, 100 S. Ct. 2455 (1980)).* [*62] Courts, however, will not find bad faith lightly: to constitute bad faith the conduct at issue must rise to a "high level of egregiousness." Judge, at 4.

The record here compels the conclusion that Koll has acted in bad faith and vexatiously. This is not a case where a defendant resists a contractual liability on grounds as to which reasonable men could differ. On the contrary, Koll explicitly recognized and acknowledged that it was contractually obligated to pay its share of the 1988 Tax Period liability, and it never contended otherwise until after its efforts to finance that obligation had failed. Only at that point, for the first time, did Koll contest liability, threaten litigation, and force plaintiffs to prosecute this action and litigate defenses that had no factual or legal merit. Koll admits that it did this in order to delay payment of its contract obligation, which would be the functional equivalent of obtaining the financing that plaintiffs had refused.

A finding of bad faith is inferable from Koll's conduct alone. However, any lingering doubts on that score are removed by the trial testimony of Mr. Pacini, Koll's Chief Financial Officer:

Q. And in fact, didn't [*63] you tell Mr. Meister [of Abex] in your conversations with him that Abex should finance Koll because if Abex didn't, you would achieve the same result by litigating the case?

A. I don't know that those were my exact words.

Q. Something along those lines?

A. I told them our lawyers were analyzing the agreements.

Q. Didn't you tell him that you would use the litigation to finance this obligation?  Yes or no?

A. I don't recall.

Q. Why don't you look at 217 of your deposition.

        * * *

BY MR. COHEN:

Q. Beginning at line fifteen on 217, did I ask you these questions and did you give these answers on May 16th, 1994:

"Question: Did you ever tell Mr. Meister that he, Abex, should finance Koll because if it didn't, litigation would be lengthy and, in effect, the delay inherent in litigation would amount to a financing?

"Answer: I may have said something along those lines. "Question: You did say something along those lines, didn't you?

"Answer: Yeah. I was suggesting to him that it would be better to negotiate a financing and it would save everybody the time and expense of litigation. I mean, that's—

"Question: What you told Mr. Meister in March was that by  [*64]  litigating, you would achieve the same result as a financing; correct?

"Answer: I don't remember if those were the words I used, but it may have been along those lines.

"Question: That was the substance of what you said to him; correct?

"Answer: (No audible response.)

"Question: You have to say 'yes.'

"Answer: Yes."

That was true. Wasn't it Mr. Pacini?

A. Yes.

Q. In fact, at the time, you told Mr. Underberg, Abex's general counsel, the same thing, that you would use the litigation to force Abex to finance Koll's payment obligation. Isn't that so?

A. I believe so.

Q. You said it, didn't you?

A. I may have said something along those lines.

Q. Why don't you look at page 389 of your deposition. Second volume, 389, beginning at line seven.

Question: — let me ask, did I ask you these questions and did you give these answers under oath on May 17th, 1994:

> "Question:  Did you tell Mr. Underberg at any time prior to April 15th, 1994, that: "The litigation would give Koll breathing room to pursue its development plans without paying its tax obligation and force Abex to finance its payment obligation?
>
> "Answer: Again, those are not my exact words, but  [*65]  something along those lines.
>
> "Question:  The substance of that is correct, right? "Answer: yes."

And that's what you said. Right Mr. Pacini?

A. Yes.

Q. And that was true. Correct?

A. Yes.

(Pacini Tr. at 369–72).

    Our legal system places the highest value upon a citizen's right of access to the courts to resolve legitimate legal grievances. Because judicial actions that might chill the free exercise of that right are disfavored, attorneys' fee awards on bad faith grounds are rarely granted. On the other hand, where a party, for no legally valid reason,

refuses to honor a clear legal obligation and forces the institution of litigation for the sole purpose of causing delay, such behavior threatens to bring our legal system into disrepute. In such a case, no court should countenance that conduct or hesitate to employ remedies designed to deter it. Koll's conduct in this case rises to the "high level of egregiousness" required for the Court to order it to pay the reasonable counsel fees and expenses it forced plaintiffs to incur in prosecuting this otherwise needless litigation.

Accordingly, plaintiffs are entitled to an award of their reasonable counsel fees and expenses, [*66] in an amount to be determined after the entry of judgment. n17

n17 It must be emphasized that the Court's criticism of Koll's conduct, and its adjudication of bad faith, is directed only to Koll, not to its counsel. Plaintiffs make no claim, and there is no evidence, that Koll's law firms had an improper motive or purpose in discharging their professional responsibility to defend their client's position in this action, and nothing in this Opinion should be so construed.

* * *

Counsel shall confer upon and submit an appropriate form of Final Order and Judgment.

**2**

LEXSEE 1993 DEL CH LEXIS 51

**Business Funding Group, Inc. v. Architectural Renovators, Inc., et al.,**

**C. A. No. 12655**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1993 Del. Ch. LEXIS 51*

**January 4, 1993, Submitted**
**March 31, 1993, Decided**

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1]

Francis J. Trzuskowski, Esquire, Trzuskowski, Kipp, Kelleher & Peace, P.A., P. O. Box 429, Wilmington, DE 19899.

John D. Demmy, Esquire, Morris, James, Hitchens & Williams, P. O. Box 2306, Wilmington, DE 19899.

**JUDGES:** JACOBS

**OPINIONBY:** JACK B. JACOBS

**OPINION:**

Now pending is the defendants' motion to dismiss this action for lack of subject matter jurisdiction. For the reasons that follow, the motion will be granted.

I.

The plaintiff, Business Funding Group, Inc. ("BFG"), is in the factoring business; that is, it enters into contracts to purchase, at a discount, specific identified accounts receivable of those business entities that want to convert their accounts receivable into immediate cash.

On October 12 and 31, 1990, respectively, BFG entered into two Separate purchase and sale agreements whereby BFG purchased specified accounts receivable from each of the defendant corporations. Transferred under these agreements were numerous invoices representing approximately 250 account debtors of the defendant corporations.

Under this factoring arrangement, the defendant corporations would continue collecting the accounts receivable and would remit the proceeds to BFG. To secure the collection of the full amount [*2] of the accounts receivable sold to BFG, the corporate defendants granted to BFG security interests in all of the defendants' then-

existing and future (i) accounts receivable not sold to BFG, (ii) contract rights, and (iii) general intangibles (the "collateral"). BFG's security interest in the collateral was perfected in accordance with Article 9 of the Delaware Uniform Commercial Code, 9 Del. C. §§ 9-101 to 9-507 (the "UCC").

BFG was unable to collect all of the accounts receivable it purchased from the defendants. Therefore, BFG took several steps to enforce its rights under the agreements. First, pursuant to the UCC, BFG notified the defendants' account debtors that payment of such accounts should be made to BFG and not to the defendants. n1 Second, BFG demanded an opportunity to inspect the defendants' book and records—a demand to which neither defendant responded. Third, BFG filed this action for an accounting on July 21, 1992.

> n1 In response to this notice, BFG learned from some of those account debtors that their debts were not owed to the corporate defendants, but were owed to a new corporation that had been formed by the corporate defendants' principals.

[*3]

The defendants then moved to dismiss this action for lack of subject matter jurisdiction.

II.

The general jurisdiction of this Court is limited to matters and causes in equity. *10 Del. C. § 341*. Where there is a sufficient remedy at law this Court is without jurisdiction. *10 Del. C. § 342*.

Ordinarily an action for an accounting is properly cognizable in equity. However, the fact that the plaintiff has chosen to characterize its action as one for an accounting is not dispositive of the jurisdictional question. The Court may go beyond the prayers of the complaint and look at the substance of what the plaintiff seeks, to determine whether or not what the plaintiff really seeks

1993 Del. Ch. LEXIS 51, *3

is obtainable at law. *Hughes Tool Company v. Fawcett Publications, Inc., Del. Ch., 297 A.2d 428 (1972),* rev'd on other grounds, *Del. Supr., 315 A.2d 577 (1974).*

What the plaintiff really seek in this case is money damages. That is, plaintiff seeks to recover the amount of its losses due to the accounts receivable in default, plus interest and attorneys' fees expressly made recoverable under the purchase and sale agreements. The plaintiff, [*4] BFG, does not deny that it seeks to recover monies owed to it under the agreements. It argues, however, that it may pursue that recovery pursuant to an accounting. Whether or not BFG is correct is the question presented.

Both sides agree that for this action to be treated as one for an accounting cognizable in equity, it must satisfy the traditional jurisdictional standard. Under Delaware law an accounting lies only where (i) there are mutual accounts between parties, (ii) a fiduciary relationship exists and the defendant has a duty to account, or (iii) the accounts are all on one side but there are circumstances of great complication. *Cheese Shop Int'l, Inc. v. Steele, Del. Ch., 303 A.2d 689, 690,* rev'd on other grounds, *Del. Supr., 311 A.2d 870 (1973);* see *Boxer v. Husky Oil Co., Del. Ch., 429 A.2d 995 (1981).* BFG contends that this case satisfies the second and third criteria, i.e., the defendants are fiduciaries having a duty to account to BFG, and this case involves circumstances of great complexity. Neither argument has merit.

First, the parties' relationship, which is defined [*5] exclusively by the purchase and sale agreements, involves an arm's-length commercial dealing and bears none of the earmarks of a fiduciary relationship. No person reposes special trust in and reliance on the judgment of another, and no special duty exists on the part of one person to protect the interests of another. *Cheese Shop Int'l, Inc., 303 A.2d at 690.* The plaintiff negotiated the protection it needed in the factoring agreements, which included comprehensive security agreements. A security agreement does not create a fiduciary relationship between a debtor and creditor. 8 Anderson on the Uniform Commercial Code, § 9–201:5, at 653 (3d ed. 1985). To hold that every account debtor is a fiduciary of the secured creditor would superimpose upon the statutory scheme of com-

mercial law a body of common law doctrines that the UCC was intended to supplant.

Nor is there merit to the argument that this case is so complex that the common law remedy of damages is inadequate. In *McMahon v. New Castle Associates, Del. Ch., 532 A.2d 601, 605 (1987),* the Chancellor observed:

> Historically, an accounting by a non-fiduciary [*6] has been required by a court of equity only when the accounts are so complex that the legal remedy is likely to prove inadequate. See Pomeroy's Equity Jurisprudence § 1421 (1941). This historical basis of equity jurisdiction reflects the fact that discovery in civil litigation was originally available in Chancery but not in the law courts. Given the development of broad and liberal discovery rules in our law courts, it now seems likely that equity shall rarely, if ever, have to be resorted to in order to determine the state of accounts in a purely commercial relationship.

In this "purely commercial relationship" the plaintiff asserts that the broad discovery rights available in the Superior Court are inadequate to determine "the state of accounts." Nowhere has the plaintiff supported that assertion. The amount of money damages plaintiff seeks appears easily calculable from the agreements and invoices and the plaintiff's own records. And through civil discovery the plaintiff can ascertain the facts necessary to determine the defendants' affirmative defenses. Accordingly, the plaintiff has failed to establish that an action for damages at law would not be a sufficient remedy. [*7]

* * *

For those reasons, the defendants' motion to dismiss for lack of subject matter jurisdiction will be granted, and the action will be transferred to the Superior Court pursuant to *10 Del. C. § 1902.* Counsel shall submit a form of order implementing this ruling.

Jack B. Jacobs

**3**

LEXSEE 1995 DEL CH LEXIS 84

**METRO AMBULANCE, INC., a Delaware corporation, Plaintiff, v. EASTERN MEDICAL BILLING INC., a Delaware corporation, DAVID A. PODLASECK, JOSEPH A. PODLASECK and PHYLLIC PODLASECK, Defendants.**

. C.A. No. 13929

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1995 Del. Ch. LEXIS 84*

**March 28, 1995, Submitted
July 5, 1995, Decided**

**NOTICE:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1]

David Roeberg of ROEBERG, MOORE & ASSOCIATES, P.A., Wilmington, Delaware. Attorney for Plaintiff.

Richard E. Berl, Jr., of BERL & JONES, P.A., Georgetown, Delaware. Attorney for Defendants.

**JUDGES:** Myron T. Steele, Vice-Chancellor

**OPINIONBY:** Myron T. Steele

**OPINION:**

**MEMORANDUM OPINION**

**STEELE, Vice-Chancellor**

Plaintiff Metro Ambulance, Inc. ("Metro") filed this action against defendant Eastern Medical Billing, Inc. ("EMB") and its principals (collectively, "Defendants") seeking an accounting of Metro's money and property in EMB's possession; the imposition of a constructive trust on the funds and the property; and a declaratory judgment and damages for breaches of contractual and fiduciary duty. Defendants have filed a motion to dismiss for lack of jurisdiction arguing Metro has an adequate remedy at law. This is the decision on the motion to dismiss.

**I. BACKGROUND**

Metro is a Delaware corporation with offices in Dover,

Delaware. Metro transports medical patients and bills the costs of their service to patients or their health insurance carriers. EMB is a Delaware corporation with offices in Bridgeville, Delaware. EMB provides billing services for health care providers. [*2]

On October 21, 1993, Metro and EMB entered into two contracts: a "Services Agreement" and a "Contract for Billing and Collection of Accounts." The Services Agreement authorized EMB to receive, process and forward medical claims information for billing purposes on behalf of Metro. Metro agreed to pay EMB 10% of any amount EMB collected

The Contract for Billing and Collection of Accounts supplements the Services Agreement ("the Contract"). The Contract provides for EMB to bill for and collect Metro's accounts receivable. Section 6 of the contract sets forth EMB's compensation. Section 6 obligates Metro to pay EMB 10% of the total amount collected on each current individual account. For accounts delinquent as of October 21, 1993. Metro agreed to pay 25% of the amount EMB collected. Section 5 of the contract allows Metro, upon notice, to suspend EMB's collection efforts.

Pursuant to the Services Agreement and the Contract, Metro gave EMB all unpaid transportation services records and its source documents to EMB for its billing and collection services. EMB maintained the records of Metro's accounts receivable and processed all of Metro's invoices.

Metro failed to pay $55,000.00 in [*3] EMB commissions. EMB began to retain payments it received for Metro's accounts receivable and applied the funds to Metro's balance. Not surprisingly, on August 30, 1994, EMB suspended processing new claims.

On October 11, 1994. EMB filed suit against Metro in the Superior Court of the State of Delaware. *See Eastern Medical Billing, Inc. v. Metro Ambulance, Inc.,* Del.

Super., C.A. No. 94C-10-011. Metro answered with a general denial, and included a counterclaim for compensatory and punitive damages exceeding $100.000. Metro filed this action on the same day it filed the answer in the Superior Court case.

Metro makes several allegations against EMB. Metro alleges (1) EMB, in derogation of the agreements, requested the payor make payment to EMB instead of Metro; (2) EMB failed to keep Metro's funds separate from EMB funds; (3) EMB refuses to give an accounting of funds EMB received for Metro's accounts; (4) EMB commingled Metro's account records with another entity's account records; (5) EMB refuses to return Metro's original source documents; (6) EMB has entered information which, if processed, would result in billings, but EMB refuses to process the information; (7) EMB [*4] fraudulently coded Metro's van transportation as ambulance transportation n1 to increase EMB's revenue.

> n1 Apparently, Medicare will not pay for van transportation services, but ambulance transportation costs are compensable.

## II. CONTENTIONS OF THE PARTIES

Defendants contend the Court of Chancery does not have jurisdiction over this action because Metro has an "adequate remedy at law." They assert this action is based on the commercial contracts which clearly define the relationship between the parties. They argue, consequently, Metro can obtain full, fair and complete relief through money damages and a declaratory judgment in Superior Court.

Metro contends the legal remedies are "woefully inadequate and wholly incomplete, impractical and inefficient." Metro asserts the contracts created fiduciary duties between the parties, which give rise to equity jurisdiction. Metro also argues the equitable remedies it seeks — namely, an injunction, an accounting and a constructive trust establish exclusive equitable [*5] jurisdiction.

## III. LEGAL STANDARD

The Court of Chancery does not have jurisdiction to entertain a cause of action if the plaintiff has an adequate remedy at law. *10 Del. C. § 342; Hughes Tool Co. v. Fawcett Publications, Inc., Del. Supr., 315 A.2d 577, 579 (1974).* An adequate remedy at law must afford the plaintiff "full, fair and complete relief." *Id. at 579.* The legal remedy must be as practical to the ends of justice and to prompt administration as the remedy in equity. *International Business Machines Corp. v. Comdisco, Del. Ch., 602 A.2d 74, 78 (1991); Family Court v. Department of Labor and Indus. Relations,*

*Del. Ch., 320 A.2d 777, 780 (1974).*

Chancery jurisdiction is not conferred merely through a request for equitable relief. *McMahon v. New Castle Assocs., Del. Ch., 532 A.2d 601, 603 (1987); see IBM, 602 A.2d at 78.* As Chancellor Allen stated:

> Chancery jurisdiction is not conferred by the incantation of magic words. Neither the artful use nor the wholesale invocation of familiar chancery terms in a complaint will itself excuse the court, upon a proper motion, from a realistic assessment of the nature [*6] of the wrong alleged and the remedy available in order to determine whether a legal remedy is available and fully adequate.

*Id.* If the legal remedy is available and fully adequate, the Court will not accept jurisdiction. *Id.*

## IV. ANALYSIS

Metro argues the contract creates a principal/agency relationship. Metro asserts this relationship imposes fiduciary duties on EMB, including, *inter alia*, a special duty to protect the interest of Metro, a duty to account for and immediately pay to Metro all Metro funds in possession of EMB and a duty of good faith, loyalty and honesty with respect to all matters within the scope of the agency and the agreement. *See* Compl. P 12(a)-(f). Metro contends, therefore, that the existence of this fiduciary duty provides grounds for equitable jurisdiction.

Equity will exercise jurisdiction over a fiduciary relationship. *McMahon v. New Castle Assocs., Del. Ch., 532 A.2d 601, 604 (1987).* This court has already explained when a fiduciary relationship exists:

> A fiduciary relationship is a situation where one person reposes special trust in and reliance on the judgment of another or where a special duty exists [*7] on the part of one person to protect the interests of another. The relationship connotes a dependence.

*Cheese Shop Int'l, Inc. v. Steele, Del. Ch., 303 A.2d 689, 690, rev'd on other grounds, Del. Supr., 311 A.2d 870 (1973); McMahon v. New Castle Assocs., Del. Ch., 532 A.2d 601, 604 (1987).* The traditional relationships recognized by equity as "special" are express trustees and corporate officers and directors. *Id. at 604–05.* Delaware has recognized several other relationships which also carry the "special" nature of a fiduciary relationship, including: general partners; administrators or executors; guardians;

and, in special circumstances, joint venturers or princi-ples and their agents. *Id. at 605* (citations omitted). The existence of a principal/agent relationship does not, in and of itself, give rise to a fiduciary relationship. *Maull v. Stokes, Del. Ch., 31 Del. Ch. 188, 68 A.2d 200, 202 (1949)*. A fiduciary relationship will arise when there is an element of confidentiality or a joint undertaking be-tween the principal and agent. *McMahon, 532 A.2d at 605.* The hallmark of this form of special principal/agent relationship is when matters are [*8] peculiarly within the knowledge of the agent. *Maull, 68 A.2d at 202.*

The parties here bargained for and defined their re-lationship, including the protection of their particular in-terests, in two commercial contracts. Metro paid EMB a commission to service its accounts. In order to fulfill the terms of the contract, EMB maintained records of Metro's accounts created with information Metro gave to EMB. EMB, in turn, gave Metro all the information it had available on a periodic basis. This is a straight forward commercial transaction, with both parties fulfilling their obligations *under the contract.* No special knowledge, element of confidentiality or dependence exists which would lead me to conclude the parties had a fiduciary relationship. I will not artificially manipulate the parties' commercial relationship to create fiduciary duties where none exist. Metro can still recover under the traditional duty to deal in good faith and act honestly under the writ-ten contracts — a duty fully recognized at common law.

The remaining issue is simple and straightforward — does Metro have an adequate remedy at law? Metro, in its complaint, has attempted to assert two traditional [*9] equitable remedies: an accounting to determine Metro's property in possession of EMB (Court I); and a construc-tive trust over Metro's property (Count II). n2

> n2 *In a separate "motion,"* Metro requests an injunction to prevent EMB from collecting Metro's receivables. This request for relief is not in the complaint. Metro filed the Notice of Motion and "Motion for Order Enjoining EMB" on the 22nd of February 1995, the same day it filed an answering brief in opposition to EMB's Motion to Dismiss and more than two months after filing its complaint in this Court. A declaratory judgment from Superior Court that EMB breached the contract will end the collection effort as it addresses the monetary claims and counterclaims of the parties. I cannot consider requests for relief that appear only as an afterthought but not in the original complaint.

As I have already stated, the parties' designed and defined their relationship in the contracts, including their rights and obligations. Metro, in reality, seeks money damages [*10] for EMB's actions which it claims consti-tute a breach of contract.

Metro seeks an accounting of all monies, records, documents and accounts receivable records in EMB's pos-session. A non-fiduciary accounting, standing alone, no longer justifies chancery jurisdiction. As Chancellor Allen describes this principle:

> Historically, an accounting by a non-fiduciary has been required by a court of eq-uity only when the accounts are so complex that the legal remedy is likely to prove inad-equate. *See Pomeroy's Equity, Jurisprudence § 1421 (1941).* This historical basis of equity jurisdiction reflects the fact that discovery in civil litigation was originally available in chancery but not in the law courts. *Given the development of broad and liberal discovery rules in our law courts, it now seems likely that equity shall rarely, if ever, have to be resorted to in order to determine the state of accounts in a purely commercial relation-ship.*

*McMahon, 532 A.2d at 605* (emphasis added). The amount of damages Metro seeks can be easily calculated from either Metro's own records or EMB documents pro-duced in discovery. Metro has a sufficient remedy at law.

Metro also [*11] seeks a constructive trust over Metro's account receivable records and funds EMB "wrongfully converted." (Compl. at P 19.) The Court will impose a constructive trust when "a defendant's fraudu-lent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owned some duty." *Adams v. Jankouskas, Del. Supr., 452 A.2d 148, 152 (1982).* A constructive trust, not premised on an equitable right, will not succeed in conferring equity jurisdiction unless it relates to specific property or identi-fiable proceeds of specific property. *McMahon, 532 A.2d at 609.* Metro's claim for a constructive trust is not based on an equitable theory of beneficial entitlement. Metro de-sires money damages. The source documents are nothing more than a tool for calculating the damages. The doc-uments can be "recovered" through discovery in a court of law. Furthermore, an adequate legal remedy exists for conversion in an action at law for trover. *IBM, 602 A.2d at 78.* Therefore, Metro has an adequate remedy at law.

**V. CONCLUSION**

Metro's complaint solely presents an action for dam-ages based on an arm's length commercial contractual

1995 Del. Ch. LEXIS 84, *11

relationship. [*12] Metro has a full, fair, complete and therefor adequate legal remedy for its claims.

The complaint is dismissed for lack of jurisdiction.

**IT IS SO ORDERED.**

Myron T. Steele

Vice-Chancellor

**4**

LEXSEE 1981 DEL CH LEXIS 577

**Preston v. Preston**

**Civil Action #6049 (1979)**

**Court of Chancery of Delaware, New Castle County**

*1981 Del. Ch. LEXIS 577*

**February 27, 1981, Date submitted**
**April 16, 1981, Decided**

**PRIOR HISTORY:** [*1]

ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT: DENIED, ON ONE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT: DENIED.

**LexisNexis(R) Headnotes**

**COUNSEL:**

Robert E. Schlusser, Esquire, MURDOCH & WALSH, P.A., P.O. Box 949, Wilmington, DE 19899; Charles S. Crompton, Jr., Esquire, POTTER, ANDERSON & CORROON, P.O. Box 951, Wilmington, DE 19899; Donald F. Parsons, Jr., Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL, P.O. Box 1347, Wilmington, DE 19899

**OPINIONBY:**

HARTNETT

**OPINION:**

MAURICE A. HARTNETT, III, *VICE-CHANCELLOR*

UNREPORTED OPINION

The plaintiffs and defendant–Wilmington Trust Company filed cross–motions for partial summary judgment which must be denied because there are questions of fact which must be determined at trial.

I

The plaintiffs, James W. Preston and Lorraine M. Getz, are the residuary beneficiaries of a private inter vivos trust established by Daniel J. Preston, M.D. prior to his death in 1978. They seek reformation of the Trust Agreement, contending that Dr. Preston mistakenly relied on an erroneous statement of the value of the trust assets supplied to him by the trustee — Wilmington Trust Company, a defendant — when preparing the trust instrument.

They further allege that if Dr. Preston [*2] had known the actual value of the trust assets he would have increased their share of the trust, at the expense of The Delaware Academy of Medicine ("Academy"), the beneficiary of a charitable trust created within the Preston Trust, and also a defendant in this action. The other defendants are the remaining beneficiaries and the trustees of the Preston Trust.

Two of the defendants have also filed claims which are joined in this action. Defendant–The Academy of Medicine has asserted a cross–claim against Wilmington Trust Company for negligence and breach of trust to cover any losses it may incur in the primary cause of action. Defendant–Wilmington Trust Company answered by filing a counterclaim against the plaintiffs for a declaratory judgment that the Preston Trust comports with Dr. Preston's intentions and that Wilmington Trust Company is not liable to plaintiffs for negligence, breach of contract, or breach of trust in connection with the administration of the Preston Trust. Additionally, Wilmington Trust Company has asserted several affirmative defenses against plaintiffs, claiming in part that the complaint is barred by the Statute of Limitations (*12 Del. C. § 1309*) and [*3] the equitable doctrine of laches.

Plaintiffs seek summary judgment on Wilmington Trust Company's counterclaim for a declaratory judgment, while Wilmington Trust Company seeks a judgment on its affirmative defenses.

II

On February 15, 1954, Dr. Daniel J. Preston created a revocable inter vivos trust, and named Wilmington Trust Company as trustee. Wilmington Trust Company continued to serve in this capacity until Dr. Preston's death

on February 6, 1978. It presently serves as trustee for the beneficial interest of the Academy under the Preston Trust. The interests of defendant–Amy B. Preston, and of plaintiffs–James W. Preston and Lorraine M. Getz created under the Preston Trust are now administered by the Bank of Delaware as successor trustee.

Dr. Preston amended his trust on four separate occasions — the most recent taking effect on December 16, 1977, by virtue of his execution of the Supplemental Trust Agreement which is the subject of this suit. The basic alterations effected by the Supplemental Trust Agreement provided that upon Dr. Preston's death the Academy would receive a specific gift from the trust assets in the amount of $500,000. and that the plaintiffs [*4] would receive equal shares of a residuary estate trust.

Prior to the execution of the Supplemental Trust Agreement, Dr. Preston had obtained from Wilmington Trust Company a schedule of the trust assets. This schedule indicated that the value of the Preston Trust assets totalled $1,515,974.39 as of November 10, 1977. This total was based upon a clerical error by employees of the Bank in connection with the valuation of certain units of two separate bond investments trusts held in the Preston Trust. Wilmington Trust Company has admitted that these bond investment trusts were incorrectly reported as having a total value of $543,689.50. The correct value as of November 10, 1977, of these units was $54,368.95 and the total value of the trust assets was $1,026,653.84 — not $1,515,974.39.

Plaintiffs maintain that if Dr. Preston had been aware that the trust assets were less valuable than reported by Wilmington Trust Company, he would have given smaller proportional gifts to the other beneficiaries and he would have altered the pro rata distributions of the Academy and plaintiffs. On this basis, plaintiffs' demand that the Preston Trust be reformed by this court and that [*5] a constructive trust for their benefit be placed upon the funds otherwise to be distributed to the Academy.

III

Motions for partial summary judgment as to uncontested fact issues under Rule 56(d) are not looked upon with favor. *Burgans v. New York Central Railroad Co., S.D. N.Y., 192 F.Supp. 222 (1961)*. Primarily, the purpose of Rule 56(d) is to salvage some results from the judicial effort involved in the denial of a motion for summary judgment under Rule 56. It does not authorize the initiation of a motion, the sole object of which is to adjudicate issues of fact which are not dispositive of any claim thereof, as is sought here. *Yale Transport Corp. v. Yellow Truck & Coach Manufacturing Co., S.D. N.Y., 3 F.R.D. 440 (1944)*. See *Bernardo v. Bethelem Steel Co., S.D. N.Y.,*

*169 F.Supp. 914 (1959); Chorbanjian v. Pan American World Airways, S.D. N.Y., 19 F.R.D. 321 (1956)*.

IV

The plaintiffs, in their motion for partial summary judgment, seek a determination of whether the actions of the Wilmington Trust Company constituted negligence or breach of fiduciary duty, totally separate and apart from whether those actions were the proximate cause of damage to any [*6] party. To establish a prima facie case with respect to either of these torts, plaintiffs must demonstrate the existence of four elements: (1) the existence of a legal duty; (2) an act which breaches this duty; (3) a causal connection between the defendant's conduct and the plaintiffs' injury; and, (4) damage to the plaintiffs. PROSSER, The Law of Torts § 30 (4th ed.); Restatement Second of Torts § 281. The plaintiffs, however, are seeking summary judgment based on only two of the necessary elements: one and two. They point to the legal duty of a professional fiduciary to provide accurate accounts and the uncontested fact that Wilmington Trust Company mailed an inaccurate valuation of the assets in the Preston Trust to Dr. Preston, as conclusive of negligence on the part of the Bank.

While Chancery Rule 56(c) provides that the issue of liability may be determined separately from the issue of damages, it does not provide that the various elements necessary for liability should be determined separately. For the Court to separately determine each element necessary to establish liability would be to impose an intolerable burden on the Court and would violate the doctrine [*7] of judicial economy. An order setting forth a finding that one element of liability was present (for example — the existence of a legal duty) without a finding that there was also a breach of the duty and a causal connection between the breach and damage would be a meaningless order of little or no help in resolving the litigation because it would not be dispositive of any part of the claim. *Sparks v. England, W.D. Mo. 1 F.R.D. 688 (1941)*. Judicial economy, the primary objective of a Rule 56 motion, would therefore not be promoted because there would be no gainful result in piecemeal adjudication of a cause.

Simplification of issues, which is in essence what the plaintiffs seek here, can be had by use of a pretrial order which defines the issues in dispute and recognizes certain facts as uncontested. 6 MOORE'S Fed. Prac. P56.20[1]. It is not therefore feasible or helpful to grant partial summary judgment on the limited issue of whether Wilmington Trust Company breached an existing legal duty without adjudicating the other two necessary elements for liability to accrue: that there is a causal connection between Wilmington Trust Company's conduct and the injury [*8] and the existence of damages.

The existence of these two latter elements, which must be present for a finding of liability cannot be determined from the present record.

The plaintiffs also seek summary judgment on the issue of whether the actions of Wilmington Trust Company constituted breach of contract. They contend that the Trust Agreement is a contract which Wilmington Trust Company breached by sending Dr. Preston an inaccurate valuation of the trust assets. Language from the Trust Agreement, "this is a Delaware contract and creates a Delaware trust," is quoted as evidence of an admission of the contractual relationship by Wilmington Trust Company. Wilmington Trust Company counters that there was no contractual relationship between it and Dr. Preston and that the Trust Agreement is in the nature of a conveyance of a beneficial interest and cannot be treated like a contract.

Insufficient facts are in evidence to decide this issue at this time. It is still undetermined who drafted the quoted provision, and the intent of the parties as to its meaning has not been adduced. Agreements between parties are to be construed liberally so as to carry out the intention of [*9] the parties, *Hajoca Corp. v. Security Trust Co., Del. Super., 25 A.2d 378 (1942),* but any ambiguities in the Agreement's language must be construed against the drafter. *Radio Corp. of America v. Philadelphia Storage Battery Co., Del. Ch., 6 A.2d 329 (1939).* This issue cannot be adjudicated until all relevant facts are before the Court. Plaintiffs' motion for summary judgment must therefore be denied. So ordered.

V

Wilmington Trust Company's cross motion for partial summary judgment seeks a determination that this complaint is barred by *12 Del. C. § 1309* or the equitable doctrine of laches.

A six-month statute of limitations is mandated by *12 Del. C. § 1309* in all actions contesting the validity of a will. The statute provides:

§ 1309. Review of proof of will; procedure.

(a) Any person interested who shall not voluntarily appear at the time of taking the proof of a will, or be served with citation or notice as provided in § 1303 of this title, shall, at any time within 6 months after such proof or after delivery to the Register of Wills of self-proved will, have a right of review which shall on his petition be ordered by the Court of Chancery; [*10] but unless the petitioner or petitioners shall, within 10 days after such review shall have been ordered by the Court, give bond to the State, jointly, and severally if more than 1 petitioner, with such sureties and in such sum as the Court

determines, conditioned for the payment of any and all costs occasioned by such review which may be decreed against such petitioner or petitioners, such petition shall be considered as abandoned and shall be dismissed and proceedings may be had in all respects as though no such review had been ordered. Upon such review there shall be the same proceedings as upon a caveat, and the allowance of the will and granting of letters may be affirmed or the will rejected and the letters revoked.

(b) The Court of Chancery may determine the costs occasioned by such review and decree the payment thereof.

The purpose for a six-month limitation is to permit the prompt and orderly administration of estates. *Criscoe v. DeRooy, Del. Ch., 384 A.2d 628 (1978).* Wilmington Trust Company, in its cross-motion for summary judgment, contends that this suit is in essence a challenge of Dr. Preston's testamentary scheme based upon a mistake which distorted his dispositive [*11] intent and therefore the statute relating to a review of a will is applicable. It suggests that the statute should be strictly construed, otherwise disgruntled heirs would be able to collaterally attack the validity of a will years after the statute has run by characterizing a trust as a document of independent significance although it is incorporated by reference in the will. For example, see In the Matter of Estate of Rocco Arcaro, Del. Ch., C.A. No. 4725 (Jan. 10, 1977). Wilmington Trust Company however misconstrues the holding in that case.

In Arcaro, the testator executed a will and deed of trust six days prior to his death. Any assets which passed by the residuary clause of the will poured over into a trust which was incorporated by reference in the will. The deed of trust adopted by incorporation was like any other bequest, the validity of which depended on the validity of the will. Such is not the case with the Preston Trust. It was created prior to the will and existed independently of it. The vast majority of Dr. Preston's assets were held in the trust prior to his death. The will made two small bequests of personal property and real estate, with [*12] the estate's remaining assets pouring into the already existing trust. The validity of the Preston trust did not depend on the will for its validity. Thus, the cause of action in this case should be construed as a suit to reform a trust agreement based upon mistake, not a will contest. This is a purely equitable action which is not, therefore, controlled by the statute of limitations set forth in *12 Del. C. § 1309,* but the equitable doctrine of laches.

The doctrine of laches is used to determine the timeliness of an equitable claim. *Bovay v. H. M. Byllesby & Co., Del. Ch., 22 A.2d 138 (1941).* What constitutes laches cannot be determined by an established rule, for

1981 Del. Ch. LEXIS 577, *12

the question must be viewed in light of all the circumstances in each case. *Wright v. Scotton, Del. Supr., 121 A. 69 (1923).* Thus, decision on this affirmative defense must await trial of all relevant evidence.

Wilmington Trust Company's cross–motion for partial summary judgment is also denied.  So ordered.